Good morning. May it please the Court, Chris Barsky for the Plaintiff Appellant, Mike Currie. I'm going to keep an eye on the clock and try and reserve a few minutes for- Could you speak a little- For rebuttals, sorry. Thank you. Now, essentially there's a few issues on this case. There's two, there's a reasonable accommodation claim and the intentional discrimination claim. And although intentional discrimination was brief first, I'd like to address the reasonable accommodation claim first because I think that's really where the trial court went wrong in analyzing the issue. Reasonable accommodation claims are analyzed under the modified burden-shifting approach, which courts have held is analogous to strict liability. The first question becomes whether a reasonable accommodation was possible. The second question, whether it's an undue burden on the employer. Did your client ask for an accommodation? Yes. His requested accommodation was that the drug testing policy, which precludes him from being hired for a positive drug test, was a barrier to his employment. And he requested that that drug test be waived because he had a prescription medication that could explain the drug test. The clinic, in return, basically asked for all his medical records. Now, they asked to see his medical records. It wasn't clear what they were looking for. But nonetheless, my client signed a release. Now, looking back, he told them he had a prescription. And he did have a prescription. And? Well, so they asked for his medical records. And if he had a prescription from the doctor, it would have been noted in the, I would think. It should have been noted. In this case, unfortunately, he called in his prescription. For a number of years, his nonprofit insurance carrier that was providing his prescriptions for HIV medications, they weren't covering Marinol. So after having a meeting with his caseworker, it was disclosed that the insurance that he had was now covering Marinol. And he called his doctor on the phone and requested a script. His doctor mailed him a script or mailed it to the pharmacy down in Tucson. And that was received in the mail. Now, remember as well that Mike Curry in this case never got the opportunity to understand that there was no evidence of that prescription in his medical file. The clinic, when they called him back, stated that it's our policy not to hire for a positive drug test and we can't go forward with employment. He had no idea until initial disclosure statements when he called me and said, what do we need for disclosures? I said, well, I don't think we need your entire medical file. Just get a copy of your prescription. He called his doctor at that point six months into litigation and it was discovered that, you know, my doctor doesn't have a prescription. So it was at that point that, you know, six months into litigation that we didn't we finally realized that there was no prescription in the medical file. The But he asked the clinic if he had a prescription, would that cure the drug test, right? And they told him right. And so he says, I'll get you my prescription. And then he calls them up and he says, you're going to need a medical release. I'm going to come over and sign a release so you can get my records. Right? Is that what happened? He said that it should be in my medical files and I have a prescription for it. The clinic at the time said, okay, well, let me call you back. They went to their head administrator and asked them what to do. He received a phone call back a few minutes later and they said, okay, we're going to need a medical release, we're going to need to see your medical records. At that point he went in and signed the disclosure. But he testified that it occurred to him that they would need a release and that he called them up and told them they would need a release and that he would be down there to sign the release. I think he said that. Yeah. That was the third phone call. After saying, hey, we're going to need to see your medical records, I think it was unclear at that point, does Mike Curry get them? Does the clinic want them? And I think my client understood that they wanted them sent directly. And remember as well that he was coming down from Prescott, which is three hours north of Phoenix. So at that point they kind of sent him home. So he's driving home. He couldn't really get those records himself, so he figured to expedite this, I'll give you a medical release to get what you need. So that's the third phone call. He called them back and said you're going to need a medical release if you want to get them directly. Well, I guess what I was getting at is that after they called him and said you're going to get hired because you flunked the drug test, I mean, did he say anything to them about what about my prescription? You told me a prescription would fix the problem. It wasn't a conversation. It was just a voice message where they said that we're not going to go forward with it. No, but did he call them back right after? He didn't call them back, no, because he didn't realize that they didn't receive the documentation. He didn't realize that that was an issue or even potentially a barrier to the employment situation. And the EEOC guidelines are clear on that issue. When an employer receives insufficient information, they have to inform the employee why that information is insufficient and give them an opportunity to follow up and get additional information if needed. What does that have to be? What does the requirement of documentation have to do with this disability? I mean, how does that – I mean, isn't it like the case where the person couldn't afford to provide some financial information or something like that, and the court found that there was no causation between the barrier and the disability? I mean, his having HIV didn't prevent him from providing documentation. No, the reason he was prevented from providing documentation was because the clinic never explained to him that this was a potential issue that had come up and there was insufficient evidence. So it's different than the Weintraub case and the cases that the opposing counsel cites out of the East Coast, because in those cases there was a back and forth, a good faith back and forth saying, you know, we need this documentation, et cetera. And really the documentation issue, I think the reason why they wanted documentation was not necessarily because was it a reasonable accommodation, but was he a qualified individual with a disability? Is he using illegal drugs? Is HIV a concern in the workplace? So that really goes to liability here. Let me ask you this. Under the regs and under the scheme that was in force here, once he took the test and it came back positive, was the employer required to do a confirmation test? Were they the second test? Is that what you're referring to? I don't think they were. I don't see a reason why they would have to under the ADA. They might as a business practice, but, you know. So they get back this information that he tests positive, right? Why couldn't they have just said, you test positive, we're not hiring you? Because at that point he informed them that the reason I tested positive was because I'm taking medication to manage the antiretroviral medications and I'm taking from HIV. That policy was a barrier to his employment, and at that point they were obligated to make a reasonable accommodation for him. He tells them I'm taking Marinol. Right. Right. And then they ask for documentation of that, correct? I think, yeah, down the road he said I'm taking Marinol and I should be in my medical files. They then called him back and said we're going to need to see documentation. After asking questions, are you taking medical marijuana? You know, what is Marinol? What are you taking antiretrovirals for? So after that medical inquiry, at that point they asked for documentation. And when they get it, there's no indication that a prescription for Marinol had been issued by his doctor. What they received in return was 11 pages of medical records spanning a decade of HIV treatment. We don't quite know why so few records came back, but at that time he had informed his doctor that he was looking for, he was going to be moving to Phoenix and he was going to seek a new primary care physician for HIV treatment in the Valley. So, I mean, we don't know why so few records came back. He does know that, you know, there's a pretty hefty volume of medical records at one point. But nonetheless, 11 pages of medical records spanning a decade of treatment for an HIV patient is insufficient by any standards. They told him that's all they had when they sent him. Isn't that correct? That's correct. But it doesn't mean that's all that exists. It doesn't mean that more may have existed. And it also doesn't mean that there's information that you might need that aren't otherwise in these medical records. I mean, I think the medical practice, as in any profession, if there is an absence of written documentation, you can always pick up the phone and ask them, you know, have you ever prescribed Marinol? I mean, if it was done, it's, you know, done over the Internet nowadays. It's done over the phone. I mean, a lot of times these aren't getting to the medical files. And, you know, do you have I'm a little surprised by that. Is that clear? That would be a doctor's practice to issue prescriptions and not record it in his files? Yes. You have all kinds of liability issues there the doctor would want to be very careful of. Yeah. I think, you know, obviously it's probably common practice for the physician to try and make sure that that's noted in the medical file. But I don't think Do you have anything in the record on this? I didn't see anything. I didn't see anything from Dr. Downing that suggested that he had recorded this in his files any place. We've got a statement later on that says I prescribed this. Right. There was nothing at that time that said that he was taking Counsel, I'm still interested in the reasonable accommodation. It seems to me that what your client was asking for was reasonable accommodation of his drug use and not for reasonable accommodation of his HIV. There's anything then there in the accommodation that you're suggesting that really goes to the question of his HIV. It goes to the question of his having tested positive for drugs. Right. Employers have to reasonably accommodate not only the disability in this case, which would be HIV, but they also have to accommodate any limitations associated with that HIV. And we contend that a valid prescription to treat the antiretroviral medication would be a limitation associated with his HIV, which is the disability. So we do contend that they have to accommodate all the issues and not just the HIV, because the HIV has only manifested itself through certain symptoms and side effects that have to be treated in ordinary life, which are medications and all the other. But why the reasonable accommodation has to burden, has to be a facially neutral requirement that burdens the disabled person disproportionately more than others? How does a drug test or a documentation requirement, I mean, the documentation requirement was an added benefit to somebody who tests positive. How does that burden the disabled person disproportionately in comparison to other people? Because it tends to screen out persons with disabilities. Because if, okay. If you have a neutral policy, you're not only going to screen out the people who are smoking, you know, legal drugs or doing illegal drugs, but you're going to screen out the person who's been prescribed legal medications to. No, because it has a documentation provision that says that their policy says you can explain it. If you can explain it, you can get over the fact that you tested positive under our drug policy. So they give you the opportunity under the policy to provide an explanation. And what I'm not clear on is why that policy to let you explain it discriminates against the disabled. It's just that you can tell them, I have a prescription. And I think that portion of the – first of all, there was no requirement or no – nothing in the file that says you must provide documentation. One portion said you must – anybody who tests positive will be fired. The other portion of the policy says anybody who tests positive and cannot sufficiently explain it will be fired. Mike Curry contends that he sufficiently explained his positive drug panel. The reason why they asked for documentation after the fact was because they didn't think he was a qualified individual with a disability, and they didn't get that information because they didn't ask the right questions in the medical inquiry. Do you want to save some time for rebuttal? Yes, I do. Thank you very much.  May it please the Court. My name is Don Johnson, and I'm the attorney for the Appalee-Beatrice Keller Clinic. The clinic is noted in the paperwork as a medical practice with different offices based in Sun City, Arizona, and was hiring for a – called a Moe's Tech opening. And Mr. Curry's situation arises from his application for that opening. Taking the Court's lead, I'll focus my remarks first on the issue of reasonable accommodation. We disagree with counsel in his characterization of what the first question is. He stated that the first question is whether some accommodation is possible. We suggest that's not the first question, and the Court focused on what the real question is at first. The question is whether the employer's neutral policy or practice imposes a barrier against the individual based on the individual's claimed disabling condition. And as Judge Vance focused in on, the neutral barrier in this case did not focus on Mr. Curry's HIV status, his disabling condition. It focused on the – his inability to provide a prescription for the medication that he claimed to be taking. This is not a barrier that imposes any burden upon anyone on the basis – because of his or her disability. It's a barrier that imposes a restriction based on whether someone can produce a document or not. During the Court's colloquy with counsel, I was reminded coming up on the plane yesterday, a family member set off the alarm going through security. Well, here's the letter from her doctor explaining why that is so, because of a certain medical condition that has the effect of setting off the alarm when you go through security. And here's the letter from the doctor explaining that. The security measures are not a barrier that focus on someone's disability or discriminate against anyone on the basis of their disabling condition. It would have discriminated against her if she hadn't had a letter. And that's a key difference. So the reasonable accommodation question, we believe that Judge Silver got it right when she noted that the barrier that Mr. Curry faced here was whether or not he could produce a prescription to verify his statement that he was taking this medication. And so, as Your Honor noted, we asked the – we asked his doctor for medical records, and they sent back, quote, all we have, unquote. And there's no dispute that those records don't contain any prescription for the substance. They don't contain any discussion or any notation that a prescription was ever written, and they don't contain any reference to the substance at all, such as a contemplated prescription that might come in the future or that may have been issued in the past. There's no evidence in those medical records that he was prescribed Marinol. And so when the employer acted on the basis of his failure to explain to their satisfaction his positive drug test, that's the barrier. Did they alert him that the records that they received from the doctor, doctor's office, didn't show that he had ever been issued a prescription? They did not, Your Honor. Did they have any obligation to do so once they? No, sir. They did not. The notion from counsel that the EEOC's regulations place a burden on us to follow up with the individual when documentation supposedly is insufficient, that's they're talking about a different animal in that circumstance. The EEOC regulations are talking about a situation where there's a dispute or a question about the nature of a disabling condition and the nature of whether the condition imposes some restriction on the individual or not. In other words, where we're having a discourse between employer and employee or perhaps employee's physician, if the employer questions the sufficiency of whatever documentation the employee has presented to indicate that he or she has some condition that needs help, naturally there's going to have to be a discussion or a dialogue between the employer and the employee about that, the sufficiency of that documentation. But here we're talking about documentation that has no bearing at all, does not arise from his disabling condition. It's a completely different type of documentation involved that we suggest does not fall within the scope or any sort of reasonable characterization of the EEOC's regulations dealing with the employer's obligations when they question the sufficiency of documentation. When the employer, just to summarize, when the employer has a question about whether this individual really is disabled, that's when we have to have a discussion about the sufficiency of the documentation. When the undisputed fact is that the individual tested positive for an illegal substance and the employer, to respond to your point, Your Honor, the employer at that point under the ADA would have been completely justified in saying positive drug test, the deal's off. That's explicit under the ADA. In this case, the employer gave him the opportunity to say, well, what's your explanation? He says, I have a prescription. And they say, well, okay, we need to see it. And he couldn't show one. And so there's no question about whether he's, there's no discussion going on about the nature of his disability. There's a discussion going on about the bona fides of his prescription. But that's a completely different issue than the nature of his disabling condition. I can't remember from my, I looked at this the other day, but I can't remember. But so after they got the medical records, they, did they notify him that he just wasn't going to get a job offer? There was, they left him a voicemail that afternoon saying they were not proceeding, whether it was withdrawing the job offer or terminating employment, whatever you, I can't remember the exact text. I think counsel quotes it in the excerpts. But the voicemail was to the effect, we're not proceeding further. We don't hire on the basis of a positive drug test. Words to that effect. So that's the message that was left for him a few hours after the positive drug test. And was there any follow-up by Mr. Curry at that point? Not until we got the EEOC charge, Your Honor. I see. That's his testimony in the record is that he didn't pursue the issue any further. And before the EEOC, did he ever produce a prescription? I will confess, Your Honor, I can't remember what evidence was presented to the EEOC. It said before. I'm sorry, Your Honor? It said before the EEOC charge. In other words, before a charge was filed, certainly no evidence was ever presented to the clinic that he had a prescription. We don't know what he might have submitted to anybody else, but he, there was never any follow-up or dialogue or presentation of any data to the clinic between the time of the voicemail and the time of the filing of the EEOC charge. And during discovery, was there ever a prescription that was produced? I can't remember whether this is in the record, Your Honor, but the fact is when we took, I believe it was Mr. Curry's deposition, he brought in a bottle with the empty medication bottle, as it were. I don't know whether that's in the record, but that was a fact below that he did have the bottle with the prescription. Did he have an RX number on it, you know, the location where he got it from and all of that? Your Honor, I can't remember whether that was on the bottle. I believe it was. Here's some other facts that were in the record. We did, forgive me again, I can't remember whether it was our side or the plaintiff's side who subpoenaed the records from the apothecary shop in Tucson. And the, so the distributor of the substance did produce a set of documents which are consistent with a prescription for Marinol for this individual. Now, what we pointed out to Judge Silver below, she didn't base her decision on this, but we feel is an important consideration. That prescription was a year old at the time of this positive drug test. And the prescription was for a 30-day supply with no refills. Mr. Curry also confirmed that at the time of the drug test he had not seen that doctor in months. In fact, he no longer considered that individual to be his doctor. Now, this ties into the other argument that we made, Your Honor, which is under the scope of the ADA's protection. And so we suggest that the record compels that conclusion as well. That in this case, when one, well, I guess for purposes of setting the context of this argument, Your Honor, let's assume that Mr. Curry did get a prescription for Marinol in March of 2008, a year before these events. Query whether his doctor should have written that down somewhere, but no dispute that he did not. But regardless, he then kept the 30-day supply, according to his testimony, and just used the drug whenever he felt he needed it, even though he was no longer under his doctor's care. As we argued below and in briefing in this Court, we suggest that that is the illegal use of that substance. It's not under the doctor's care or supervision, which is the phrase from the statutory definition of illegal use of drugs. So that was another basis for the case. That's not what the district court judged. That's not the basis on which the district court argued. Correct. Her rationale was on the issue of the plaintiff's failure to present the requisite evidence of pretext. Okay. So I think the reasonable accommodation question we think is we're pretty much finished with that, unless the Court has any other questions for the defense side on that. I'd be happy to address those. Let me turn to the other issues on the disability discrimination issue. The first issue in the briefing, but it hasn't been discussed yet, we suggest obviously that Judge Silver got it right, that there is a, that this case presents almost a stereotypical example of the difference between facts versus one speculation about what might or must have happened. Mr. Curry's briefing is based upon probably a legitimate fear or concern that some people in the world react negatively to the news that he shared with the clinic that day. He uses the word hysteria, the fear that we might bring someone with HIV into the clinic. Well, we suggest again that Judge Silver saw through it and got it right and noted a variety of failings on the plaintiff's part and a variety of other evidence on the defendant's part, all of which indicate that summary judgment was appropriate based on failure to show any sufficient evidence of pretext. For example, Mr. Curry focuses on his claim that Ms. Schonhold, the assistant with whom Curry was dealing during the drug testing, began to stutter and seemed uncomfortable. We've scoured, we've done the research at some length, can't find any case law that seems to support the notion that when someone starts to stutter, that that's evidence of some discriminatory animus against the individual they're speaking with. We did cite, to Your Honors, some case law for the point that certainly the plaintiff cannot divine whether someone else appears uncomfortable or is uncomfortable based on the evidence that they're, that's being shared with them. The plaintiff argued that we acted too quickly in withdrawing the offer of employment. Well, as counsel pointed out, there was a discussion with Mr. Curry about why there was, what's the reason for this positive drug test. He explained, well, I have a prescription. Let's talk to my doctor. They, the doctor sent all we have, and the records were clearly, did not contain any evidence of any prescription. That's not acting too quickly. That's giving him a chance to try to explain, and that chance has, he has failed to explain. And so to act on that basis is not, certainly not acting too quickly. Then the plaintiff says, well, then we acted too strictly. We acted too harshly. We should have given him more chances to explain. We should have gone farther than we did. Well, the fact is, as this Court's precedents recognize, at that point, the plaintiff ventures into business judgments about how the employer ought to manage its operations, in his opinion. And as the Court knows, those are not areas that are subject to challenge by the plaintiff, by me, by the EEOC, by the Court. If the employer acts in a manner that an outsider might feel is strict or harsh, that's legitimate. It's only when the employer acts on the basis of the individual's protected class status, in this case his HIV status, that the Court, that it becomes a legal issue. And as Judge Silva recognized, there was simply no evidence, none of the specific and substantial evidence required to overcome the legitimate nondiscriminatory reason for the action to either withdraw the offer or terminate the employment however you want to look at it. Unless Your Honors have any questions about any of the other issues that are raised, I'll submit my argument. There don't appear to be any other questions, so thank you, counsel. Thank you, Your Honor. With respect to the intentional discrimination claim, I think at a minimum we've shown sufficient evidence of pretext to warrant a jury trial on this issue. The district court found that there was evidence of pretext in a couple scenarios, but just simply overruled them and found that some of the actions were reasonable. The intentional discrimination claim is not a negligence claim. It doesn't matter if the employer acts reasonably. What we try and discern is the specific intent of the employer and whether it's motivated by an animus towards a disability. And in this case, this Court has held that the burden to show pretext is hardly an issue to be zealously guarded to be able to vet these things out at trial. So here I think at a minimum these issues should go to a trial. I think the trial court weighed the evidence in this case and didn't address a lot of things, especially imposing counsel's sights, the stuttering or the appearance of being uncomfortable. That was the case of an Asian in the workplace where she testified that the other co-workers appeared uncomfortable around here. Here we don't just have Mike Curry saying they were uncomfortable. We're saying that they were stuttering, which is something different than just his testimony that they appeared uncomfortable. So that we also haven't addressed the similarity-situated applicant, which wasn't addressed at the trial court, but I think at a minimum this should go to trial. Okay. We've got your briefs and heard you. Thank you. We appreciate your arguments this morning. They're helpful. Both sides. Thank you.
judges: Vance, Paez, Bybee